CENTRAL ALASKA BROADCASTING,
INC., Appellant,

v.

Carl A. BRACALE, Jr., Appellee.

No. 5480.

Supreme Court of Alaska.

Dec. 11, 1981.

Robert A. Mintz, Burr, Pease & Kurtz, Inc., Anchorage, for appellant.

Ronald Offret, Aglietti, Offret & Pennington, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

OPINION

COMPTON, Justice.

This is an appeal by Central Alaska Broadcasting Company (CAB) from a superior court judgment against CAB for breach of an employment contract. Suit was brought by Carl Bracale, Jr., who was employed by CAB as general manager of KIMO, an Anchorage television station owned by CAB.

At trial, the court denied CAB's motions for directed verdict and for judgment notwithstanding the verdict. A jury awarded Bracale $308,701.65, including costs, interest and attorney's fees, for wrongful discharge. The issue raised on appeal is whether CAB was entitled to judgment in its favor as a matter of law or, if not, whether the court's instructions on materiality misled the jury. We answer the first question in the affirmative and therefore do not reach the second question.

The jury based its decision on a determination that Bracale's admitted breach of contract was not material and therefore did not justify discharge of Bracale. Over CAB's objection, the jury was instructed on the elements relevant to a determination of materiality. In response to special interrogatories, the jury found that Bracale was

"obligated" to follow CAB's directive to fire an employee, Sam Stewart, but that his refusal to do so was not a material breach of contract.

## I. FACTS OF THE CASE

Bracale was the general manager of KHAR, another Anchorage television station, when that station went off the air in 1970. Bracale was convinced that the station could be made profitable and he brought together a group of investors to buy it. The sale was consummated and in 1971 KIMO became KHAR's successor. Bracale was KIMO's general manager, president, principal stockholder and one of the five directors of CAB from the corporation's inception until he was fired in 1976.

Bracale's contract as general manager of KIMO stated in part:

> As General Manager, EMPLOYEE [Bracale] shall have and exercise all management authority and right over programming, personnel, and business operations subject to the supervision and control of the Board of Directors. . . .

Bracale's current five-year contract ran from September 1974 to September 1979.

The primary source of revenue for the station was from advertising sales. In 1973, Bracale rehired Sam Stewart as sales manager. Stewart had previously been employed as an advertising salesman for KIMO. KIMO increased its audience under Bracale's management from 1973–76.

On October 31, 1975, the Board of Directors passed a motion to terminate Stewart's employment immediately. The reason given for firing Stewart was Stewart's heavy drinking, which interfered with his work and caused the company embarrassment.[1] The board believed that firing Stewart was necessary to "[r]eestablish the confidence and good will of the company's clients and to regain the company's reputation in the community. . . ."

The board directed Bracale to fire Stewart. However, Bracale thought Stewart was a good employee and an asset to the company. He therefore refused to follow the board's directive.

At a meeting on November 17, 1975, the Board of Directors extended the time to terminate Stewart's employment until the end of the year so that a suitable replacement for him could be found. At the end of the year, Bracale still refused to fire Stewart. The board then discharged Bracale at a board meeting held on February 5, 1976, citing as its reason his refusal to follow the board's directive. It also alleged various financial abuses that had been discussed at prior board meetings.[2] Thereafter, Bracale filed suit against CAB for wrongful discharge in violation of his employment contract with CAB.

## II. MATERIALITY OF THE BREACH AS A QUESTION OF LAW

CAB argues that the board's order to fire Stewart was reasonable as a matter of law because it was consistent with the contractual duty owed by Bracale. It is undisputed that Bracale's refusal to follow the board's directive was willful. From this, CAB concludes that Bracale's refusal to obey its order is a material breach of contract as a matter of law. Therefore, CAB asserts that the court's instruction on materiality was erroneous, and under the circumstances, reversible error. Furthermore, it was error for the court not to grant CAB's motion for a directed verdict or its motion for a judgment notwithstanding the verdict. We agree.

Section 385(1) of the Restatement (Second) of Agency (1958) provides: "[U]nless otherwise agreed, an agent is subject to a duty to obey all reasonable directions in regard to the manner of per-

---

1. There was a dispute between Bracale and the other board members about whether Stewart's drinking interfered with his work, although several times Stewart had to leave work because he was drunk. There was no dispute that Stewart was a heavy drinker.

2. Since 1975, the board had been concerned with and had investigated Bracale for his excessive expenditures and lack of discretion in making expenditures.

forming a service that he has contracted to perform." Bracale acknowledges this general rule, but he argues that a willful failure to obey a reasonable order may not be a material breach of contract when the harm from the breach is small.[3] Bracale further argues that the reasonableness of the board's directive was for the jury to decide. He argues that CAB's order to fire Stewart was unreasonable and Bracale's refusal to follow the board's directive was proper. Thus, he contends, the court's instruction on materiality was proper.

■■■ We find Bracale's arguments to be without merit. The general rule that an employee's willful refusal to obey the reasonable instructions of his employer is grounds for discharge is unquestioned.[4] Equally well established is the general rule that only a material breach of contract justifies termination.[5] In the context of employment contracts, it is axiomatic that within the limits set by the contract the duty of obedience by the employee to the employer is central to the agreement.

Whether the relationship created by an employment contract is that of principal and agent or master and servant, there is a right of control by the employer over the employee set by the terms of the contract. *See* Restatement (Second) of Agency §§ 1–2 (1958). The manner in which the control is exercised may vary, but that relates to the reasonableness of the directive, and not to the materiality of the element of control. This element of authority is the central distinction between an employee and an independent contractor. Restatement (Second) of Agency § 220(1), comment e (1958). In this sense, any willful refusal to obey a reasonable directive is an act that strikes at the very heart of the contractual relationship existing between an employer and his employee. It is this factor which underlies the general rule, recognized by Bracale, that willful disobedience of a reasonable order justifies discharge.

■■■ The brief quotation from the Restatement cited by Bracale does not support his position that when the harm resulting from a breach is small the breach may not be material. To the contrary, both Williston and Corbin agree that such a refusal is a ground for immediate discharge.[6] Thus, when an order given is reasonable and consistent with the contract, the failure to obey it is always a material breach as a matter of law.

Bracale admits that the order given was consistent with his employment contract. The employment contract gave the Board of Directors direct control of his management functions, including matters relating to personnel. The board had the authority to terminate an employee for any reason. The board also had the authority to order Bracale to fire any employee. There is no evidence to show that the board's reasons

---

**3.** In support of his position, Bracale is able to point only to this language in the Restatement (Second) of Agency § 409, comment b (1958): "A wilful disobedience . . . *may* constitute a material breach of contract although the harm likely to arise from such breach is very small." (Emphasis added.)

**4.** 3A A. Corbin, Corbin on Contracts § 679 (rev. ed. 1960); 9 W. Jaeger, Williston on Contracts § 1013B (3d ed. 1967); Restatement (Second) of Agency § 385(1) (1958); 53 Am.Jur.2d *Master and Servant* § 54 (1970).

**5.** Restatement of Contracts §§ 274(1), 313, comment c (1932).

**6.** Williston distinguishes three kinds of disobedience: (1) negligent disregard of an order, (2) willful but nondefiant disregard, and (3) disobedience "accompanied with an element of insubordination," involving "a direct refusal to rec-ognize the master's authority in regard to the matter in question." This last sort, he says, "though relating to a trivial matter and though causing no damage, will always justify immediate discharge." 9 H. Jaeger, Williston on Contracts § 1013B, at 49 (3d ed. 1967) (footnote omitted). In the notes supporting this rule, Williston refers to the very same comment in the Restatement of Agency that Bracale relies on for the proposition that such disobedience is not always a material breach. *Id.* at 50 n.7. Corbin is less analytical but more succinct: "When an employer gives a reasonable direction as to the performance to be rendered, within the limits thereof provided by the contract, the employee's wilful disobedience is ground for discharge." 3A A. Corbin, Corbin on Contracts § 679 (rev. ed. 1960) (footnote omitted).

for ordering the firing of Stewart were arbitrary or merely a screen to accomplish an illegitimate purpose, such as the forced removal of Bracale. Bracale failed to show any change of circumstances following the board's order of November 17, 1975, that might have justified his refusal to fire Stewart or cast his refusal in a less defiant light. Thus, there is no dispute as to the continuing propriety of the board's order to fire Stewart and its authority under the contract to do so.[7]

In the instant case, Bracale admits that the board's directive was consistent with its authority under his employment contract. No reasonable juror could infer that the board's directive to fire Stewart was unreasonable. The only inference that can be drawn from the board's directive is that it was reasonable for them to order an employee to carry out a contractual obligation. Thus, we conclude that it was reasonable as a matter of law for the board to order Bracale to fire Stewart.

## III. DENIAL OF THE MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT

▮ The standard of review we apply in reviewing a trial court's grant or denial of a motion for directed verdict is to determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that fair-minded jurors could not differ in their judgment. *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974); *Otis Elevator Co. v. McLaney*, 406 P.2d 7, 9 (Alaska 1965). Viewing the evidence in the light most favorable to Bracale, a directed verdict for CAB is still compelled because Bracale admitted both that the board had the authority to order him to fire Stewart and that he refused to obey.

▮ Based upon the particular facts of this case, it was reasonable as a matter of law for the board to order Bracale to fire Stewart. Bracale twice refused to carry out the board's reasonable directive. It was improper to allow the jury to determine the materiality of the breach; the court should have ruled that the breach was material as a matter of law. The court erred in not granting CAB's motion for a directed verdict or its motion for judgment notwithstanding the verdict.

The judgment is REVERSED.

## APPENDIX I

Q. [By counsel for CAB] What was your understanding, Mr. Bracale, as to the general manager; what your responsibilities at that point and time were?

A. [By Bracale] To manage the station in the best interest of the directors and the stockholders.

Q. Who was your boss? Who were you hired by?

A. The directors of the corporation.

Q. And is it your understanding that the directors of the corporation are the governing body of a corporate citizen of the State of Alaska?

A. I'm sorry, I . . . . .

Q. Isn't it true, Mr. Bracale, that the board of directors of any corporation organized under the Alaska law is the governing body of the corporation?

A. That's true.

Q. You understood that, didn't you?

A. Yes, I did.

Q. So the board in effect was your boss . . . . .

A. That's true.

Q. . . . . under this contract? Did you have any responsibility to answer to the board . . . . .

A. Yes, I did.

Q. . . . . . in your capacity as general manager under the 1970 contract?

A. Yes, I did.

Q. Now, what control, if any, did the 1970 contract give to the board of directors over you as general manager?

A. It gave them complete control over me.

---

7. Excerpts of Bracale's testimony appear in the Appendix.

Q. Did they reserve the right, for instance, to control your activities relating to personnel of the company?

A. Yes, they did.

Q. Are you real sure of that?

A. Yes, I am.

Q. Did they reserve the right to terminate any employees of the company?

A. Yes, they did.

Q. Did they have the authority, Mr. Bracale, to direct you as the general manager to terminate anybody in the employ of the company who deserved to be terminated for any reason that the board seemed—found fit?

A. Yes, they did.

. . . .

Q. . . . [T]ell me whether or not paragraph [5 of the 1974 contract] outline[s] your duties as the general manager.

A. Yes, it does.

Q. What specifically does it have to—does it say with regard to your relationship with the board of directors?

A. It says I'm under the supervision and control of the board of directors.

Q. You're what?

A. Under the supervision and control of the board of directors.

Q. Now, what is your understanding of that term?

A. I meant that to be exactly what it meant, under the supervision and control of the board of directors.

Q. What effect if any would it have as to a directive of the board given to you, Carl Bracale, Jr., to perform a certain act pertaining to personnel, for instance?

A. I think they have that right.

. . . .

Q. . . . [T]he board first ordered you to fire Sam Stewart the 31st of October, 1975?

A. That's correct.

Q. Did you fire him?

A. No, I did not.

Q. And you came back on the 17th of November and [said], "[W]e've got to have some time," or "I'd like time until the 31st of December to find a replacement," and the board said, "[O]kay, we'll go along with you, Carl Bracale, general manager, you can have until the 31st of December, 1975, and then you fire him," right?

A. I submitted to the board what I thought would be reasons to retain the man.

Q. And they chose to ignore it.

A. And I did not—I did not fire him at that point.

Q. Okay. They chose to ignore the reasons that you advanced, is that a correct statement?

A. They extended his termination date until the end of the year, that's correct.

Q. And on the 31st of December, 1975, you then had another obligation, a continued obligation to fire Sam Stewart and you didn't do it?

A. That's correct. I reported that to the board on February 5th.

. . . .

Q. . . . Now, we have established already that you refused to fire Sam the first time on October 31, 1975, that . . . as of 31 December 1975, you once again refused the direct order of the board [a] second time, am I correct?

A. I stated my reasons, but you're correct.

Q. Okay. Thank you. Now, the next question is on both of those occasions did you refuse to obey a directive of the board of your own volition in a free and voluntary manner?

A. I think I stated my reasons.

Q. Would you answer my question, sir? Was it a free and voluntary act, this refusal to follow the board's directive on two separate and distinctive occasions?

A. Yes, it was a free and voluntary act on my own.

. . . .

Q. Now, can we agree, Mr. Bracale, on the basic fundamentals of corporate management that the general manager, such as you were on the 31st of October, 1975, were subject to the lawful exercise of management responsibilities of the board of directors?

A. I felt I was doing my lawful duty.

Q. You haven't answered my question though. Can we agree that—and do you agree with me that as general manager you were subject to the lawful exercise of the board of directors' functions, will you agree with that proposition?

A. Yes.

Q. Yes?

A. Yes.

Q. Will you also agree with me that one of the provisions of your contract said that you will exercise control over personnel subject to—subject to—the control of the board of directors, do you agree with that proposition?

A. I agree with that.

Q. And do you agree that they gave you an order to discharge a person under you supervision and you refused to do it?

A. I stated my reasons why I refused to do it.

Q. Do you admit that you refused to discharge him not once but twice?

A. I tried to continually, as I stated before.....

Q. Would you please answer my question; did you or did you not on two occasions refuse to follow an expressed, very clear, explicit directive of the board of directors of this corporation?

A. That's true.
   ....

Q. ... [Paragraph 5 of the 1974 contract states:] "As general manager employee shall have and exercise all management authority over programming, personnel and business operations subject to the supervision and control of the board of directors." ... Now, we've established that was in your contract at the time of

your termination. My question is, Mr. Bracale, is it your contention before this judge and before this jury that with that provision in your contract that you were at liberty, of your own volition, and by your own judgment to refuse to obey a direct order and directive of the board of directors pertaining to a matter concerning personnel, i.e., the discharge of Sam Stewart?

A. I stated my reasons before and I'll state them again; I do not feel that I violated that provision.....

   ....

Q. ... Is that true or is that not true, yes or no, that you in your judgment had a right to refuse to obey a direct order pertaining to personnel[?]

A. I did not have the right to refuse to obey a direct order.

Q. Thank you.