ARCO ALASKA, INC., a corporation;
Jerry Wight; John D. Snell: and Kirk
R. Rowles, Appellants and Cross–Appel-
lees,

v.

Alden Paul AKERS, Appellee and
Cross–Appellant.

Nos. S–1923, S–1947.

Supreme Court of Alaska.

April 22, 1988.

Charles P. Flynn, Barbara A. Norris, and C. Renee Manes, Burr, Pease & Kurtz, Anchorage, for appellants and cross-appellees.

Kenneth R. Atkinson, Atkinson, Conway & Gagnon, Anchorage, for appellee and cross-appellant.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

Paul Akers, was employed by ARCO Alaska, Inc. for approximately six and one-half years as a mechanical technician at Prudhoe Bay. This appeal concerns his termination.

## FACTS

Akers accepted an offer of employment from ARCO in 1976. At that time he was told that North Slope oil field jobs were expected to be available for approximately twenty years, the life of the field. Akers was given a Prudhoe Bay employee handbook upon his hiring and other copies from time to time as they were revised. The employee handbook which was in effect at the time Akers was discharged described ARCO's progressive discipline system.

In December 1980, Akers met with Jerry Wight, his supervisor, and Leo Anderson, Prudhoe Bay employee relations specialist, to discuss an apparent problem involving Akers' attitude. There is some dispute as to who initiated this meeting. Akers claims that the meeting was held at his request because Wight wished to put a warning letter in Akers' file which Anderson said should not be done. Wight testified that the meeting was a counseling session. At the meeting, Akers was told that he needed to improve his attitude.

Shortly thereafter, Akers was temporarily assigned to a different maintenance group at Prudhoe Bay as a vibration technician. In 1982, the company made the vibration technician position permanent and allowed employees of the company to bid for the job. Akers bid on the job, but was not selected. Again there is a dispute as to why Akers was not selected. Wight testified that he told Akers that it was because of his obstinate and uncooperative behavior toward his supervisors and fellow employees. Akers claims that he was told that it was because of the inflexibility of working hours.

When he was not selected for the permanent vibration technician position, Akers was reassigned as a mechanical technician. Upon returning to the mechanical group, Akers was told by Wight that he was required to attend periodic communications meetings which were held on company time. Akers thereafter missed a communications meeting. Akers claims that he missed the meeting because of an injury he suffered that day. Akers said that he stopped by his room before the meeting and took a pill to relieve the pain of the injury, which caused him to pass out. Akers did not contact anybody after the meeting to explain his absence.

On August 2, 1982, a day or two after the missed communications meeting, Akers was summoned to Wight's office. At that time, Akers explained to Wight why he had missed the meeting. Wight told Akers he had placed a formal letter in Akers' personnel file about his uncooperative behavior in failing to attend the meeting and for failing to notify his supervisor promptly when he did not attend. Other employees had missed communications meetings in the past and had not been reprimanded by Wight. Akers objected to the placement of the letter in his file and told Wight that it was a violation of the procedures in the employee handbook to place a letter in his file without first having a counseling session with an employee relations specialist present.

Akers then met with Kirk Rowles, an employee relations director, to discuss the letter Wight had put in his file. At that time Rowles told Akers that it was a slight deviation from company policy for Wight to have placed the letter in Akers file without Rowles present. He also told Akers he should not "rock the boat" over Wight's letter. Rowles then helped Akers write a letter in response to Wight's letter. At no time, however, did Rowles tell Akers that he had helped Wight write his letter nor that he had consented to putting it in Akers' file.

In February 1983, Akers was assigned to work as a mechanical technician at the central compressor plant. The plant used a lead technician system for organizing work crews, where one of the mechanics would take a lead role. On February 9, 1983, Akers complained to Wight about the lead technician system and told Wight he would rather take orders directly from the supervisor. Wight told Akers he should accept the system while he was assigned to that department.

On the following day, Akers told some technicians not to perform a procedure the way the lead technician had told them. It appears he also affirmatively disobeyed an instruction from the lead technician. Akers, however, specifically denied ever having disobeyed the lead technician's orders.

As a result of these actions, the plant maintenance supervisor removed Akers from the crew and sent Wight a memo indicating that Akers was unacceptable as a mechanical technician because of his refusal to work together with his fellow workers. After receiving the memo, Wight recommended that Akers be terminated for uncooperative behavior. One of the supervisors who reviewed the recommendation, and approved of the decision to terminate Akers, was defendant John Snell. Akers was terminated on February 28, 1983. At the discharge session, Akers was not given a written notice of termination as required by the ARCO supervisor's manual. Akers was verbally told at that time that he was being terminated for his inability to get along with his co-workers. Akers, however, claims the real reason for his termination was a personality conflict with Wight.

After his termination, Akers requested a meeting with the next level of supervision to review the actions which were taken. Akers arrived at the meeting accompanied by his attorney. He was told by Rowles, however, that his attorney could not attend. Akers was not given written notice of his termination at this meeting either, but he was shown a form which indicated that he was fired for his inability to get along with others. The meeting was conducted by Snell. Rowles was also present. After the meeting, Snell, who was Akers' second line supervisor, and Wight's direct supervisor, affirmed the decision to terminate Akers.

After Akers was discharged by ARCO, he applied for unemployment compensation. ARCO contracts with J.E. Frick Company to handle such claims. Frick, acting on behalf of ARCO, sent a form to the Employment Security Division of the Alaska State Department of Labor, indicating the reason for Akers' discharge as "insubordination in willful disregard of the employer's interest." This reason for discharge is a basis for disqualifying one from unemployment compensation. Nonetheless, the Employment Security Division granted benefits to Akers. ARCO administratively appealed that ruling. After a hearing, the appeal tribunal affirmed the award of benefits to Akers.

## PROCEDURE

Akers brought suit against ARCO, Wight, Rowles, and Snell. Akers claimed breach of contract by ARCO, intentional interference with contractual relations by Wight, Rowles, and Snell, and improper opposition to Akers' application for employment security benefits by ARCO. Akers also sought punitive damages on each claim. The case was tried before a jury.

At the close of Akers' case, the trial court granted a motion for directed verdict, in favor of ARCO, as to the security benefits claim. In addition, the trial court granted a directed verdict to defendant

Snell with respect to the intentional interference with contract claim. All of the other claims were presented to the jury.

The jury returned a verdict against ARCO for $51,390 in compensatory and $125,000 in punitive damages. The jury returned verdicts in favor of defendants Wight and Rowles. ARCO appeals.

## DISCUSSION

**I. DID THE TRIAL COURT ERR IN ALLOWING THE JURY TO AWARD PUNITIVE DAMAGES FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING?**

█ Punitive damages are not recoverable for breach of contract unless the conduct constituting the breach constitutes an independent tort.

> [A]warding punitive damages would be inconsistent with the policy behind contract damages: "The purpose of awarding contract damages is to compensate the injured party.... For this reason, courts in contract cases do not award damages to punish the party in breach or to serve as an example to others unless the conduct constituting the breach is also a tort for which punitive damages are recoverable."

*Wien Air Alaska v. Bubbel,* 723 P.2d 627, 631 (Alaska 1986), *quoting* Restatement (Second) of Contracts § 355, comment a (1981); *Walt v. State,* 751 P.2d 1345, (Alaska 1988).

The dispute in this case concerns whether breach of the covenant of good faith and fair dealing, which this court has held is implied in all at-will employment contracts, constitutes a tort as well as a breach of contract. *Mitford v. de Lasala,* 666 P.2d

1000 (Alaska 1983). We hold that it does not.

Some courts have held that termination of an at-will employee constitutes a tort if the discharge violates a fundamental principal of public policy. Based on this rationale, courts have held that a tort was committed where employees were discharged for refusing to participate in an illegal price fixing scheme, *Petermann v. International Bhd. of Teamsters,* 174 Cal.App. 2d 184, 344 P.2d 25, 27 (1959), for union activities, *Glenn v. Clearman's Gold Cock Inn, Inc.,* 192 Cal.App.2d 793, 13 Cal.Rptr. 769 (1961), for serving on a jury, *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975), and for filing a workers' compensation claim, *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425 (1973).

We have neither accepted nor rejected the public policy theory. *Knight v. American Guard & Alert, Inc.,* 714 P.2d 788 (Alaska 1986). Nor do we decide the issue in this case as Akers does not allege that his termination violated an explicit public policy. Instead, Akers claims that bad faith termination of his employment contract amounted to tortious conduct by ARCO. It is Akers' position that the mere violation of the covenant constitutes a tort which will support punitive damages. Thus, we are called upon to decide whether this state will permit tort recovery when the implied covenant of good faith and fair dealing is breached in an employment contract and the breach violates no explicit public policy.[1]

Some courts have allowed tort recovery for breach of the covenant of good faith and fair dealing in the employment context. Although it did not directly confront the issue, the California Supreme Court noted

---

1. The trial court held that "[b]ad faith breach of employment contracts should ... be deemed violative of state public policy." We believe that this approach is unsound. Under this theory, any breach of the covenant of good faith and fair dealing would come under the public policy exception.

   In abusive discharge cases plaintiffs have sometimes tried to make out a case that good faith in contracts is a ... State public policy, that a bad faith discharge is therefore against

public policy and that such a discharge makes out a case of tortious conduct. Allowing such an argument would shift the court's investigation from one of determining a violation of public policy to one of determining the good faith of an employer's decision. The court will not proceed down such a road....

*Kovalesky v. A.M.C. Associated Merchandising Corp.,* 551 F.Supp. 544, 548–49 n. 6 (S.D.N.Y. 1982).

the possibility that breach of an employment contract may constitute a tort.

A breach of contract may also constitute a tortious breach of the covenant of good faith and fair dealing in a situation where the possibility that the contract will be breached is not accepted or reasonably expected by the parties.... [B]reach of an employment contract by the employer can, in some situations, cause severe harm to an employee's reputation and ability to find new employment. The harm caused cannot be undone by an award of back pay.

*Seaman's Direct Buying Ser. v. Standard Oil,* 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158, 1174 (1984). Unlike the commercial context, where breaches are to be expected, it is argued, an employee entering into a contract with his employer does not anticipate a breach. Many of the lower California courts have accepted this argument and have held that the breach of the implied covenant of good faith and fair dealing constitutes a tort. *See, e.g., Khanna v. Microdata Corp.,* 170 Cal.App.3d 250, 215 Cal.Rptr. 860, 867 (1985); *Rulon–Miller v. International Business Machines Corp.,* 162 Cal.App.3d 241, 208 Cal. Rptr. 524, 533 (1984); *Wallis v. Superior Court,* 160 Cal.App.3d 1109, 207 Cal.Rptr. 123, 127–29 (1984).

The Montana Supreme Court has also allowed tort remedies for the breach of the covenant of good faith and fair dealing. In *Gates v. Life of Montana Ins. Co.,* 205 Mont. 304, 668 P.2d 213 (1983), the court held that since the duty of good faith arises as a matter of law, it was similar to the duty of good faith in insurance obligations and likewise should be afforded tort remedies.

Other courts, however, have rejected the notion that breach of the implied covenant of good faith and fair dealing in an employment contract can constitute a tort.

[W]e do not believe that Illinois law recognizes a tort remedy based on an employer's "bad faith" breach of an implied contract covenant of fair dealing.... Care must be taken to prevent the transmutation of every breach of contract into an independent tort action through the bootstrapping of the general contract principle of good faith and fair dealing.

*Martin v. Federal Life Ins. Co.,* 109 Ill. App.3d 596, 65 Ill.Dec. 143, 440 N.E.2d 998, 1006 (1982). *See also Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549, 552 (1974).

Punitive damages are not favored by the law. *Alaska Placer Co. v. Lee,* 553 P.2d 54, 61 (Alaska 1976). In our previous cases only contract damages have been awarded to wrongfully discharged employees. *See Long v. Newby,* 488 P.2d 719, 724 (Alaska 1971); *Skagway City School Board v. Davis,* 543 P.2d 218, 225 (Alaska 1975); *Mitford v. de Lasala,* 666 P.2d 1000 (Alaska 1983); *Wien Air Alaska v. Bubbel,* 723 P.2d at 631. Accordingly, we hold that punitive damages are not recoverable for breach of the implied covenant of good faith and fair dealing. Where a party's conduct in breaching a contract rises to the level of a traditionally recognized tort, such as intentional infliction of emotional distress, an action in tort would lie. Mere breach of the implied covenant of good faith and fair dealing, however, does not constitute a tort. We therefore reverse the award of punitive damages to Akers.

## II. DID THE TRIAL COURT ERR IN NOT GRANTING A DIRECTED VERDICT IN FAVOR OF DEFENDANTS?

ARCO argues that Akers failed to present any evidence indicating that ARCO lacked good cause in firing Akers or that ARCO breached the implied covenant of good faith and fair dealing. ARCO therefore concludes that the trial court erred in refusing to grant a directed verdict on these issues.

In reviewing the grant or denial of a directed verdict, we decide "whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that fair-minded jurors could not differ in their judgment." *Central Alaska Broadcasting, Inc. v. Bracale,* 637 P.2d 711, 714 (Alaska 1981). We agree with the trial court that although the evidence was not strong, it was sufficient to raise a prima facie case that Akers was terminated be-

cause of personal animosity and not for any legitimate work-related reason.

Of particular importance is the evidence which indicates that ARCO failed to follow its own procedures in terminating Akers by allowing the letter of August 2, 1982 to be presented to Akers without personnel representative Rowles present. In addition, Rowles failed to tell Akers that he had assisted Wight in drafting the August 2 letter and ARCO gave inconsistent reasons for Akers' termination (insubordination versus inability to get along with others). Also important is Akers' own testimony that he was not responsible for his termination, that he was not insubordinate, and that he was fired because of a personality conflict with Wight. This evidence is sufficient to raise an inference upon which reasonable jurors could differ on whether Akers was fired for other than just cause and whether ARCO breached the implied covenant of good faith.

ARCO contends that the burden should have been on Akers to present evidence that his termination was without good cause. In *Skagway City School Board v. Davis*, 543 P.2d 218 (Alaska 1975), we held that once the plaintiff in a wrongful discharge case shows substantial performance of his contractual duties, the burden is on the defendant to show justification for the discharge. ARCO argues that *Skagway* should not apply in this case because, unlike *Skagway*, this case does not involve an employment contract for a term of years.

It is unnecessary for us to address this issue. As discussed above, Akers presented evidence during his case that created an inference that he was discharged without good cause. Thus, even if the burden had been allocated as ARCO suggests, a directed verdict in favor of ARCO would not have been proper.

### III. DID THE TRIAL COURT ERR IN IMPROPERLY INSTRUCTING THE JURY AS TO THE MEANING OF GOOD CAUSE AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING?

#### A. *Jury Instruction: Good Cause*

The trial court instructed the jury:

Akers' First Claim is that he was terminated without good cause. You must decide whether Akers' termination was for good cause based on the provisions in Akers' contract with ARCO that describe the grounds for termination....

[Y]our inquiry must be limited to the determination of whether, under the employment contract, sufficient cause for termination existed to entitle Defendants to discharge Akers, whether or not you would have chosen to do so under the circumstances.

■ ARCO argues that this instruction was unduly restrictive in light of this court's holding in *Central Alaska Broadcasting v. Bracale*, 637 P.2d 711 (Alaska 1981). In *Bracale*, this court noted that "an employee's willful refusal to obey the reasonable instructions of his employer is grounds for discharge.... [W]illful disobedience of a reasonable order justifies discharge." *Id.* at 713. In light of that holding, ARCO offered the following instruction which the court rejected.

Before plaintiff Akers can claim that ARCO breached the employment contract, plaintiff must establish that he fully performed all of his own obligations under the contract, or that he was excused from performing them.

An employee has a legal duty to comply with the reasonable orders and policies of his employer. Disobedience of a single reasonable order or policy of the employer is a material breach of the contract by the employee.

If you find that plaintiff Akers did not perform all of his own obligations under the employment contract, then you must return a verdict in favor of defendant ARCO.

Akers argues that such an instruction was not appropriate in this case. Akers claims that "reasonable minds could differ as to whether Akers disobeyed any order from a superior." This argument misses the point. Precisely because reasonable jurors could differ on whether Akers disobeyed any orders, they should have been in-

structed on the effect if they found that Akers did disobey such an order.

Akers next argues that *Bracale* should not apply since "[i]t is obvious from reading *Bracale* that no ... detailed employee discipline scheme was present in that case." Again, Akers misses the point. In *Bracale*, we held that, as a matter of law, willful disobedience constitutes grounds for discharge in any employment contract. Thus, despite the presence of a disciplinary scheme, willful disobedience by Akers would constitute grounds for discharge.

Although the jury instruction requested by ARCO would have been helpful, the trial court did not err in refusing to give the instruction in this case. The jury was instructed that part of the employment contract consisted of the Prudhoe Bay Employee Handbook. Page thirty-four of the handbook says that one of the grounds for immediate termination is "flagrant insubordination." This provision of the employee handbook incorporates into Akers' contract the instruction that ARCO requested. In another instruction, Judge Katz instructed the jury:

> If you find ... that Akers committed one or more acts of flagrant insubordination or other conduct which would justify termination under the Employee Handbook without prior oral or written warnings, then you must enter a verdict for Defendants and need not consider any other issues.

The instructions given properly informed the jury that even one act of flagrant insubordination was grounds for immediate discharge. Thus, the essence of the *Bracale* instruction ARCO requested was incorporated into the jury instructions which were given. As such, there was no error.

### B. *Jury Instruction: Good Faith and Fair Dealing*

▇ ARCO argues that the trial court did not adequately instruct the jury on what constituted a violation of the covenant of good faith and fair dealing. The trial court instructed the jury:

> Akers' second claim is that ARCO breached the implied covenant of good faith and fair dealing in its employment contract with Akers. There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive benefits of the agreement. Each party to the contract must act honestly toward one another with respect to the contract.
>
> In managing its affairs, any business is entitled to exercise managerial discretion so long as it is exercised reasonably and in good faith. This means that even though you think a particular decision is wrong and you would have acted differently had it been up to you, as long as it was done fairly and in good faith, no breach of the contract occurs. If you find it more likely than not that ARCO did not deal fairly and in good faith with Akers in terminating his employment on February 28, 1983, then you must find for Akers on ... his second claim. Otherwise, you must find for ARCO on this claim and award no money damages on this claim.

ARCO contends that this instruction erroneously implies that discharging an employee without good cause would necessarily violate the covenant of good faith and fair dealing. ARCO claims that this is the logical conclusion since any breach of contract "will injure the right of the other to receive the benefits of the agreement."

ARCO proposed jury instructions which would have required the jury to determine whether the purpose of the termination was to prevent Akers from receiving the benefits of the employment agreement.

Akers argues that ARCO should not be allowed to raise this objection because it failed to raise the objection at trial. Akers notes that ARCO objected to the fact that the instruction impermissibly permitted tort damages on what ARCO claimed was a purely contractual matter. The trial court noted the objection and asked ARCO whether there was any objection to the language of the instruction. ARCO replied that "[t]he language as embodied is fine, Your Honor."

Civil Rule 51 states: "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Even if a party fails to properly object to jury instructions in the trial court, this court could still consider the objections if the instructions given constituted plain error. *State v. Dupere,* 709 P.2d 493, 498 n. 5 (Alaska 1985).

The instruction given does not constitute plain error. Although the trial court could have been clearer with respect to the meaning of good faith and how it differs from good cause, any error in the court's instruction was not "so substantial as to result in injustice." *Merrill v. Faltin,* 430 P.2d 913, 917 (Alaska 1967). Because ARCO failed to raise its objection to the jury instruction before the trial court as required by Civil Rule 51, we will not consider it.

## IV. DID THE TRIAL COURT ERR IN ALLOWING CERTAIN EVIDENCE TO BE CONSIDERED BY THE JURY?

### A. *Evidence as to Exclusion of Attorney From Post–Termination Meeting*

During the course of the trial, evidence was admitted that Akers requested that his attorney be allowed to attend the March 20, 1983 post-termination problem solving meeting with Snell and Rowles. This meeting was to review the termination and could have led to Akers' reinstatement. Akers appeared at the meeting accompanied by his attorney but was told that his attorney could not attend.

At the close of Akers' case, the trial court found that Akers had no legal right to have his attorney present at the March 10 meeting, and that the failure to allow Akers' attorney to be present did not give rise to an inference of malice. The trial court gave the following instruction to the jury:

During the trial, you heard some testimony regarding whether or not Akers' attorney was present at the March 10, 1983 conference after his discharge. I instruct you now that the Plaintiff had no legal right to have an attorney present at that meeting and that you consider such testimony only as it may bear on ARCO's and Rowles' good faith and fair dealing in connection with Akers' termination.

ARCO claims that the court improperly "allowed the jury to speculate in retrospect that Rowles' unwillingness to give Akers something to which he had no right to was probative on the decision by others to discharge Akers." ARCO also argues that Rowles did not participate in the decision to terminate Akers and therefore "[t]here is no nexus between the state of mind of [those who decided to terminate Akers] in deciding whether to fire Akers, and the state of mind of Rowles, days after the termination, in deciding whether to give Akers a procedural right not provided for in the contract."

We find ARCO's arguments unpersuasive. Even though Rowles did not participate in the initial decision to terminate Akers, he was nonetheless involved in the termination process. Rowles was present at the termination meeting on February 28 and Rowles advised Akers at that meeting that Akers had no recourse. Further, as the meeting of March 10 could have led to Akers' reinstatement, this meeting itself was part of the termination process. Finally, even if Akers had no legal right to have his attorney present, ARCO's failure to allow his attorney to be present is at least somewhat probative of ARCO's attitude regarding the termination. Thus, the trial court did not err in its treatment of the evidence.[2]

### B. *Report to Employment Security Division*

After Akers was discharged by ARCO, he applied for unemployment compensation. ARCO contracts with J.E. Frick Company (Frick) to handle its employment

---

**2.** We express no opinion as to whether Akers in fact had a legal right to have his attorney present at the post-termination problem solving meeting.

security claims. Frick, acting on behalf of ARCO, sent a form to the Employment Security Division indicating the reason for Akers' discharge as insubordination in willful disregard of the employer's interest.

At trial, Akers claimed that ARCO had, in bad faith, attempted to prevent Akers from obtaining unemployment compensation. At the close of Akers' case, however, this claim was dismissed because insufficient evidence had been presented. ARCO later moved that the Frick report be removed from the jury's consideration because the unemployment compensation claim had been dismissed and because there had been no evidence connecting the content of the report to any of the individuals responsible for the discharge. The trial court rejected this argument and allowed the jury to consider the report.

ARCO argues that since none of the individual defendants had anything to do with the filing of the Frick report, this evidence could not be probative of bad faith by either those individuals or ARCO.

Akers argues that the report is attributable to ARCO. The report was ARCO's response to Akers' claim for unemployment compensation. Akers claims that since the report is attributable to ARCO, the fact that the reason for termination stated in the report was different from the reason Akers was given is relevant to the claim that ARCO acted in bad faith. "Obviously, if an employer gives inconsistent reasons for the discharge of the employee, this inconsistency casts doubt on whether reasons exist for the discharge and which, if either, is the true reason."

Although the Frick report may not be attributable to any of the individuals involved in the termination of Akers, the report was nonetheless attributable to ARCO. The fact that this report listed a reason for termination that was different from the reason Akers was previously given by ARCO is relevant to the issue of whether ARCO was acting in good faith.

Thus, the trial court did not err in allowing the jury to consider the Frick report.

## CONCLUSION

The award of punitive damages is REVERSED. In all other respects the judgment of the trial court is AFFIRMED.[3]

---

**3.** We have reviewed the issues raised by Akers on cross-appeal and find they do not warrant

the granting of a new trial in this case.