Florian SEVER, Appellant
and Cross–Appellee,

v.

ALASKA PULP CORPORATION, Dennis
Huse, George Woodbury, Jess Cline,
Frank Roppel, George Ishiyama, and
Ralph Fenner, Appellees and Cross–Appellants.

Nos. S–6620, S–6920.

Supreme Court of Alaska.

Oct. 25, 1996.

Rehearing Denied Nov. 20, 1996.

James W. McGowan, Sitka, and Terrance G. Reed, Reed & Hostage, Washington, D.C., for Appellant and Cross–Appellee.

James F. Clark, Robertson, Monagle & Eastaugh, Juneau, Juneau, AK; Richard A. Kramer, Steefel Levitt & Weiss, San Francisco, CA; and Wayne W. Hansen and Paul D. Swanson, Lane Powell Spears Lubersky, Seattle, WA, for Appellees and Cross–Appellants.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

### OPINION

RABINOWITZ, Justice.

## I. INTRODUCTION

Florian Sever brought suit for intentional infliction of emotional distress, intentional interference with contractual relations, and violations of public policy, against his employer, Alaska Pulp Corporation, as well as individual officers and employees of the corporation, who refused to reinstate him because of his testimony before Congress. Summary judgment was granted against him on the public policy claims, and a jury found against him on the remaining claims. Sever now brings this appeal.

## II. FACTS AND PROCEEDINGS

Florian Sever began working for Alaska Pulp Corporation (APC) in August 1976. He worked as a millwright in APC's pulp mill in Sitka. The individual defendants in this case were all officers or employees of APC during the period relevant to this case.

After extensive labor negotiations, APC's union went on strike in July 1986. The collective bargaining agreement between the union and APC had expired on June 30, 1986. APC responded to the strike by hiring permanent replacement workers and resuming operations at the Sitka pulp mill. The strike continued until April 1987, when the union was voted out in a decertification election. During the strike Sever engaged in two activities which apparently caused him to lose his job at APC. First, in August 1986, he signed a letter to the editor of the *Sitka Sentinel*, which evidently was drafted by a group of union members. Although the letter was never published, APC officials claimed that its racist (anti-Japanese) tenor was grounds for his dismissal.

Additionally, on May 19, 1987, Sever testified before the Subcommittee on Energy and the Environment of the Interior and Insular Affairs Committee of the United States House of Representatives. The subject matter of the hearing apparently involved pro-

motion of and appropriations for timber harvesting in the Tongass National Forest, and Sever in particular testified about APC's labor practices. It is clear that the substance of Sever's testimony ran contrary to the interests of APC, and it is equally clear that APC's management was made aware of Sever's testimony.

During the period of the strike, Sever began to work for Mountain Aviation. After the strike at APC ended in April 1987, he worked full-time for that company through the beginning of 1988.

After sending him a letter directing him to request preferential reinstatement and receiving a timely response, APC notified Sever in July 1987 that he would not be reinstated. The two reasons cited for this action were Sever's employment with Mountain Aviation and his "statements and activities destructive to the Company and related logging operations." In January 1988, Sever was fired from his job at Mountain Aviation.[1]

In August 1987 proceedings against APC regarding Sever's employment were commenced before the National Labor Relations Board (NLRB). Sever prevailed before the NLRB and was reinstated with APC in October 1991. The NLRB was ultimately "persuaded by the evidence in this case that Sever's congressional testimony of May 19, 1987, was a factor in [APC's] decision not to reinstate Sever, along with his August 19, 1986 letter." The U.S. Court of Appeals for the Ninth circuit affirmed the NLRB's decision.

In 1989, Sever filed this suit alleging generally that the defendants "procured his termination from APC in breach of Alaska public policy, inflicted emotional distress upon him, tortiously interfered with his contractual rights, and violated federal civil rights and racketeering laws." APC removed the state case to federal court and moved for summary judgment. The U.S. District Court dismissed Sever's federal claims and remanded the state claims to the superior court, explicitly concluding that the claims were not preempted by the National Labor Relations Act (NLRA). The Ninth Circuit affirmed. *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir.1992).

Thereafter, both parties moved for summary judgment in the superior court. The superior court granted partial summary judgment in favor of APC, dismissing Sever's public policy claims on the grounds that Sever was not an employee of APC for state-law purposes at the time APC decided not to reinstate him. The superior court further ruled that Sever would be permitted to present his claims alleging intentional infliction of emotional distress, intentional interference with contractual relations, and civil conspiracies to commit these torts, to a jury.

After Sever's motion for a change of venue was denied by the superior court, trial was held in Sitka. The jury found in favor of APC on all of the claims before it. Sever now brings this appeal.

## III. *DISCUSSION*
### A. *Termination in Breach of Public Policy* [2]

Florian Sever alleged that the defendants "procured his termination from APC in breach of Alaska public policy." We described the nature of the claim of discharge in violation of public policy in *ARCO Alaska v. Akers*, 753 P.2d 1150 (Alaska 1988). We observed that "[s]ome courts have held that termination of an at-will employee constitutes a tort if the discharge violates a fundamental principal [sic] of public policy." *Id.* at 1153. The type of tort described in *ARCO* has been neither accepted nor rejected by this court to date. Were it to be recognized, however, this cause of action would necessarily be contingent upon the existence of a contract. This is because the duty owed in an employment context springs only from the con-

---

1. Sever's termination from Mountain Aviation forms the basis for his intentional interference with contractual relations claim in that he alleges that APC-related parties secured his termination from that job. This particular count was resolved against Sever by a jury.

2. The superior court's summary judgment ruling with respect to Sever's employment rights is subject to *de novo* review by this court. All reasonable inferences must be drawn in favor of the non-moving party. *Pride v. Harris*, 882 P.2d 381, 384 (Alaska 1994).

tractual relations between the parties. If there is no contract, there is accordingly no duty; if there is no duty, there can be no breach; and if there is no breach, there can be no action in tort. In other words, despite the fact that the action may ultimately sound in tort, the existence of a contract is a vital prerequisite. As such, the superior court's conclusion that "[s]ince, in this case, there was no contractual relationship between the parties and Count 1 [the contract claim] has been dismissed, Count 2 [the tort claim] is also dismissed," is conceptually sound.

Although the NLRB determined that APC did owe a certain duty to Sever as of June 30, 1987 and that it breached that duty, the superior court ultimately concluded that the relationship between the parties was purely a creature of federal labor law and that Sever's recovery for any action based on wrongful breach of an employment contract was accordingly limited to whatever he could secure before the NLRB.

After ruling to the contrary on two prior occasions, the superior court decided that "although Sever was an employee for federal labor law purposes while he was awaiting reinstatement, he did not have any contractual relationship with APC and his grievances against APC were appropriately resolved by the NLRB." In this respect, the court found that

at the time that the union was decertified, there were no express agreements between Sever and APC about employment. The only agreement between them had been the collective bargaining agreement. But that agreement expired or was nullified when the union was decertified. Furthermore, at the time of decertification and through the time that Sever was denied placement on the recall list, there was no other document ... that expressed or implied any terms and conditions of employment. In addition, there was no implied agreement created by the acts of either

party. In fact, as APC points out, Sever was employed elsewhere after the decertification.

(Citation omitted.)

It now falls to us to determine whether or not the superior court erred in concluding that no contractual relationship existed, for state law purposes, between Sever and APC at the time the decision not to re-hire him was made. For the reasons outlined by the superior court in the passage quoted above, we are persuaded that the superior court did not err in reaching this conclusion.

The record simply reveals no employment agreement, express or implied, between APC and Sever after he went on strike.[3] Once he went on strike, Sever was no longer under any contractual obligation to perform services for APC. Further, since Sever was under no contractual obligation to return to work when, and if, the strike finally ended, APC was likewise under no contractual obligation to re-hire him. APC's obligations with respect to its striking workers derived exclusively from federal labor law.

Additionally, it is important to note that APC had replaced the strikers with permanent replacement workers. In *United Food & Commercial Workers Union, Local No. 1496 v. D & A Supermarkets*, 688 P.2d 165 (Alaska 1984), we held that, for purposes of disbursements pursuant to AS 23.05.140, striking workers were to be considered terminated as of the date their employer hired permanent replacement workers. In that case, we observed that "[n]o provision in Alaska's labor statutes mandates that the definitions contained in the NLRA be employed as interpretive aids." *Id.* at 168.

In light of our conclusion that there was no contractual relationship between Sever and APC on June 30, 1987, we find that Sever's public policy claim was properly rejected by the superior court. With the exception of federal labor law requirements, APC was

---

**3.** Sever observes that APC characterized him and other similarly situated persons as employees on numerous occasions during the strike and that the decision not to re-hire him was referred to as a decision to "terminate." He argues that this is clear evidence that an employment contract existed. The nomenclature chosen by APC, however-

er, which would appear to have been driven largely by political and administrative concerns, is not dispositive and does little to change the underlying nature of the relationship. This language alone, in the abstract, is sufficient neither to establish a contractual relationship nor to estop APC from denying one.

free to hire Sever or not hire him as it saw fit. Since APC owed no duty to him in this regard, its decision about his employment in 1987 was not actionable.

### B. *The August 19, 1986 Letter*

Sever also claims that the superior court made two errors with respect to the letter which he sent to the editor of the *Sitka Sentinel.*

#### 1. *Collateral Estoppel* [4]

 The Administrative Law Judge in the NLRB proceedings concluded that the August 19 letter constituted protected strike activity and was not acceptable grounds for dismissal. On appeal when confronted with the allegation that the letter was disparaging and racist, the court stated that "[t]he Board did not agree with this characterization; neither do we." Sever argues that these results should estop APC from "contending, as it did repeatedly at trial, that the letter was racist."

 The three elements of collateral estoppel are: (1) collateral estoppel must be asserted against a party or one in privity with a party to the first action; (2) the issue to be precluded must be identical to that decided in the first action; and (3) the issue in the first action must have been resolved by a final judgment on the merits. *United Cook Inlet Drift Ass'n,* 895 P.2d at 950–51.

Although the first and third elements may have been met, the second was not. We conclude that the issue sought to be estopped in this case is not identical to the issue resolved in the context of the NLRB proceeding. The Administrative Law Judge concluded that the letter was protected strike activity. In reaching this conclusion, he observed that "in such matters the board permits a great degree of latitude." He then listed a series of cases and concluded that "Sever's letter does not exceed the permissible limits encompassed by the forgoing decisions."

The fact that Sever's letter fell within the ambit of protected activity under the NLRA does not mean that it is not racist for any purpose. The racist tone of a letter is not a matter of absolutes. There is nothing inherently inconsistent in concluding that Sever's letter was not racist for purposes of an NLRA adjudication but was, nonetheless, racist on some other level. The rulings regarding Sever's NLRA claims cannot be properly interpreted to establish that there was absolutely nothing racist about the letter.

Consequently, we conclude that the superior court did not err in refusing to accord collateral estoppel effect to the finding of the federal courts regarding the non-racist character of the letter.

#### 2. *Admissibility of Evidence to Support the Assertions Made in the Letter* [5]

 Sever also claims that since APC argued that the letter was racist, he should have been permitted to introduce evidence supporting the factual allegations of specific wrongdoing made therein. Sever's theory of relevancy in this case was apparently that proving the truth of the wrongful acts attributed to APC in the letter would tend to establish that the letter was not racist. The problem with this rationale is that although the letter would not be libelous if it were true that APC had committed the acts alleged in the letter, the letter might still be racist in character.

There is nothing racist about accusations of dubious business practices. It is primarily the suggestion of a connection between these dubious business practices and the fact that APC was a Japanese controlled corporation that might make the letter racist. As such, evidence tending to establish the veracity of the accusations would not be particularly probative on the question of whether or not the letter was racist.

---

4. The applicability of collateral estoppel to a particular set of facts is a legal question over which we exercise independent review. *State v. United Cook Inlet Drift Ass'n,* 895 P.2d 947, 950 (Alaska 1995).

5. A trial court's evidentiary rulings are reviewed under the abuse of discretion standard. *Municipality of Anchorage v. Frank Coluccio Constr. Co.,* 826 P.2d 316, 324 n. 8 (Alaska 1992).

On the other side of the equation, the evidence Sever wanted to admit would have been potentially cumbersome, confusing, and prejudicial. The evidence proffered apparently consisted of findings concerning an antitrust suit that involved APC. Since the facts of that suit are not directly relevant to the present case on any theory, the superior court acted appropriately in deciding not to open the issue at all. Assuming it was relevant at all, this evidence was properly excludable under Alaska Rule of Evidence 403, and, as such, we conclude that it was not an abuse of discretion for the superior court to exclude it.[6]

### C. Change of Venue [7]

Sever's next argument is that the superior court erred by refusing to grant a change of venue. He claims that because the pretrial publicity was so great, an impartial trial could not have been had in Sitka. However, Sever's counsel acknowledged at trial that there had been no pretrial publicity specifically regarding this case. Further, Sever has not been able to establish any actual prejudice among the jurors who served on this case.

Of course neither of these facts conclusively establishes that a change of venue was not required. As Sever points out, our holding in *Mallott v. State*, 608 P.2d 737, 748 (Alaska 1980) effectively relieves a party, in certain situations, from the burden of having to demonstrate actual prejudice. In *Mallott*, we adopted the ABA proposal which stated:

> A motion for change of venue or continuance shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a substantial likelihood that, in

the absence of such relief, a fair trial by an impartial jury cannot be had.... A showing of actual prejudice shall not be required.

*Mallott*, 608 P.2d at 748 (*quoting* ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press § 8–3.3(c) (2d ed. Tentative Draft 1978)).

With respect to the fact that there appeared to be no publicity regarding this particular case, Sever argues that since the law on venue seems only to require a "probability" of prejudice, case-specific publicity is not required. Nonetheless, the apparent lack of both case-specific publicity and actual prejudice undermines Sever's argument to a significant extent.

APC also argues that Sever's failure to exhaust his peremptory challenges effectively waives any claim he might have had regarding venue. We disagree. Although the relevance of Sever's failure to exhaust his peremptory challenges is clear in this context, it is also not dispositive. It is simply one factor to be considered under a totality of the circumstances analysis. *See Jerrel v. State*, 851 P.2d 1365, 1370 (Alaska App.1993), *cert. denied*, 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).[8]

Sever bases his argument primarily on a numerical analysis of the questioned jurors. He claims that 42% of the jurors whose questioning for cause was completed were ultimately dismissed for cause. Even accepting the accuracy of these calculations, which APC seems to dispute, Sever has failed to demonstrate that the superior court's denial of his venue motion was an abuse of discretion.[9] Sitka is a small community, and it is

---

**6.** Alaska Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**7.** A trial court's decision regarding a motion for change of venue is reviewed only for abuse of discretion. *Oxereok v. State*, 611 P.2d 913, 919 (Alaska 1980).

**8.** The fact that Sever declined to use his last peremptory challenge, however, is sufficient to establish that any error that might have been committed in refusing to excuse Juror Frank Richards for cause was completely harmless.

**9.** In *Jerrel*, 851 P.2d at 1369, the court of appeals said:

Although relevant, "naked statistics" alone cannot determine the existence of a substantial likelihood of unrevealed jury bias; the issue is one for the sound discretion of the trial court. *Id.* at 938–39. Relevant factors for the court to

inevitable that many potential jurors in a small community will have connections of some sort with an employer of APC's magnitude. This fact alone does not require that every trial to which the employer is a party be moved outside the community.

It appears that the superior court took adequate precautions to ensure that Sever would have a fair jury to hear his case. In light of all the factors discussed above, we conclude that the superior court did not abuse its discretion by denying Sever's motion for a change of venue.

### D. *Bifurcation* [10]

▮▮▮▮ Sever's argument that the superior court erred in bifurcating the punitive damages issue from the liability and compensatory damages issues is without merit. Sever's only substantive complaint appears to be that the bifurcation prevented him from introducing evidence regarding the various individual defendants' financial interests in APC's timber operations. In ordering bifurcation, however, the superior court explicitly allowed that in the first stage of the trial "[i]nformation about the separate financial interests of the defendants in the Tongass [would] be admitted, if relevant."

In light of this ruling, Sever's complaints about the harm that was done to him by the decision to bifurcate are moot. If Sever thought that relevant evidence regarding the defendants' financial interests was excluded, he should have appealed from particular evidentiary rulings of the superior court. In light of the absence of any such appeal, there is no indication that the superior court abused its discretion in ordering bifurcation of the proceedings.

### E. *Jury Instructions* [11]

▮▮▮▮ Sever raises several objections to the superior court's choice of jury instructions in this case. As a threshold matter, APC alleges that Sever has essentially waived all of these issues by failing to adequately object below. We consider the contested instructions individually.

#### 1. *Individual Liability for Corporate Actors*

▮▮▮ Sever proposed the following instruction: "The individual defendants are responsible for acts which they perform or cause to be performed on behalf of a corporation to the same extent as though the conduct were performed on their own behalf." The superior court declined to give the instruction, stating: "I think it's a correct statement of the law, no question, but why does the jury need to know about it?"

Although Sever may have adequately preserved his objections on this issue below, the objection was, in any event, without merit because there was no indication in any of the jury instructions that individual defendants might be immune from suit in any respect as a result of their status as corporate agents. Jury instructions 19 and 23 set forth the elements of the substantive tort claims in this case. These instructions clearly direct the jury to assign liability to any of the defendants whose actions met the substantive requirements of the torts. Since the instructions as given would simply not authorize the jury to excuse an individual defendant who met all of the elements, there was no need to instruct them that the defendants could be individually liable. Although, as the superior court observed, the proffered instruction is an accurate statement of the law, it was not

---

consider in exercising its discretion include the recency of the publicity, its potential for inflaming jurors, and the nature of the jury panel's familiarity with the trial participants. [*Newcomb v. State*, 800 P.2d 935, 939 (Alaska App.1990).] On appeal, this court must independently evaluate the circumstances surrounding the denial of a motion to change venue, but we may reverse the trial court's decision only for an abuse of discretion. *Id.* at 937.

**10.** Bifurcation of a trial is generally within the discretion of a trial court, and a ruling on this

issue will not be reversed absent an abuse of that discretion. *See A.M. v. State,* 891 P.2d 815, 828 (Alaska 1995).

**11.** The trial court's jury instructions generally involve questions of law which are subject to the independent judgment standard of review. Errors in jury instructions will not be grounds for reversal unless they caused prejudice. *Beck v. State, Dep't of Transp. & Pub. Facilities,* 837 P.2d 105, 114 (Alaska 1992).

an abuse of discretion for the superior court to refuse to give it.

### 2. Labor Negotiations

■ The superior court instructed the jury that "there was nothing improper about the negotiations between labor and management at APC in 1985 and 1986." It appears from the record that APC proposed this instruction in its original form as a means of establishing that a "slander clause" which essentially made disloyalty a ground for dismissal was legal and proper. After an extended argument, the court decided to modify the instruction so that it made no specific reference to the clause.

Although APC did not seem to approve of the instruction, Sever's counsel made no explicit objection to it as reformulated. In fact, he seemed rather positively disposed towards it. Sever now argues that although he approved of using the term "negotiations" to avoid specific reference to the clause, his earlier objections remained in force. Under these circumstances, we conclude that Sever waived his complaints about this instruction by his conduct at trial.

Even setting the waiver issue aside, however, Sever's argument about why this instruction was erroneous is extremely cursory. Although the instruction may not have been essential, Sever certainly does not demonstrate that it was erroneous as a matter of law. Giving the instruction was not an abuse of discretion.

### 3. Conspiracy

■ The superior court also instructed the jury on the intra-corporate conspiracy defense. After reviewing the entire final colloquy regarding this instruction, we conclude that Sever's counsel did not adequately object to the instructions as given.[12] When considered in context, it appears that Sever's counsel agreed that giving an intra-corporate conspiracy instruction would be acceptable so long as the exceptions to the defense were clearly and contemporaneously explained.

Even had he preserved his objection to these instructions, however, it is not a particularly compelling one. Sever does not make any real argument that the instructions given were erroneous as such. Rather, he claims that they were inappropriate in light of the facts of this case. Sever essentially takes the position that since APC never introduced any evidence tending to show that the individual defendants were acting within the scope of their employment, there were no grounds for the intra-corporate defense. Instruction 30, however, which set out the exceptions to the defense, gave him all the support he needed to make this argument to the jury.

■ Further, and perhaps most importantly, the fact that the jury did not find any of the individual defendants liable makes it virtually impossible for error in the conspiracy instructions to have been prejudicial. In light of the three factors discussed above, we conclude that there was no error with respect to the intra-corporate conspiracy defense jury instructions.

### F. Costs and Fees [13]

■ The superior court awarded APC $34,075.02 in costs and $58,560.39 in attorney's fees. Sever appeals from the award of $34,075.02 in costs and APC cross-appeals from the court's award to it of $58,560.39 in

---

**12.** Civil Rule 51(a) provides:

> **Requested Instructions—Objections.** At the close of the evidence or at such earlier time as the court reasonably directs, any party may file written requests that the court give the jury specific instructions. The court shall inform counsel of the final form of jury instructions prior to their arguments to the jury. Following the close of the evidence, before or after the arguments of counsel, the court shall instruct the jury. Additionally, the court may give the jury such instructions as it deems necessary at any stage of the trial. No party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection. Opportunity must be given to make the objection out of the hearing of the jury, by excusing the jury or hearing objections in chambers.

**13.** A trial court's fee and cost awards will not be disturbed on appeal absent an abuse of discretion. *Kaps Transp. v. Henry*, 572 P.2d 72, 77 (Alaska 1977); *Palfy v. Rice*, 473 P.2d 606, 613–14 (Alaska 1970).

attorney's fees. APC argues that the attorney's fee award was inadequate, and Sever claims that the costs award was excessive. We consider these points in order.

■ APC objects that the superior court's downward departure from the 30 percent award that is authorized by Civil Rule 82(b)(2) [14] was an abuse of discretion. We disagree. A combination of the very large number of attorneys defending this case, the fact that APC had not treated Sever fairly in the past, and the fact that a large fee award might have a deterrent effect on future employer/employee litigation led the superior court to conclude that the fee award should not exceed 7.5% of the actual fees. These justifications were valid and appropriate under Civil Rule 81(b)(3)(D), (I) and (K) [15] and, as such, we hold that the superior court did not abuse its discretion by departing from the fee award that would otherwise have been authorized by the rules.

■ Sever claims that the superior court ordered him to pay too much in costs. He claims that the cost award is excessive insofar as it includes $18,323.01 for computerized research. Civil Rule 79(b), however, explicitly includes "costs paid by the prevailing party's attorney for computerized legal research." Sever has failed to demonstrate that this research was not reasonably necessary to defend against the suit. Consequently, we conclude that the superior court did not abuse its discretion in making this particular cost award.

## IV. CONCLUSION

The superior court's judgment and rulings in this case are AFFIRMED.

---

**14.** Civil Rule 82(b)(2) provides:

In cases in which the prevailing party recovers no money judgment, the court shall award the prevailing party in a case which goes to trial 30 percent of the prevailing party's actual reasonable attorney's fees which were necessarily incurred, and shall award the prevailing party in a case resolved without trial 20 percent of its actual attorney's fees which were necessarily incurred. The actual fees shall include fees for legal work customarily performed by an attorney but which was

delegated to and performed by an investigator, paralegal or law clerk.

**15.** These subsections authorize a court, in departing from the presumptive amount, to consider "the reasonableness of the number of attorneys used ..., the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts ... [and] other equitable factors deemed relevant."