Craig HELMUTH, Appellant,

v.

UNIVERSITY OF ALASKA FAIRBANKS, Appellee.

No. S–6320.

Supreme Court of Alaska.

Dec. 29, 1995.

Kenneth L. Covell, The Law Offices of Kenneth L. Covell, Fairbanks, for Appellant.

Paul B. Eaglin, Associate General Counsel, Office of the General Counsel, University of Alaska Fairbanks, for Appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

The University of Alaska Fairbanks (UAF) terminated Craig Helmuth from employment for insubordination. The post-termination hearing officer found that Helmuth was insubordinate, warranting termination. The superior court affirmed the hearing officer's decision. Helmuth claims insufficient evidence supports the hearing officer's decision. We affirm.

### II. FACTS AND PROCEEDINGS

Craig Helmuth began working part-time as a micro-computer specialist at the UAF Geophysical Institute (GI) in late 1988. He was subsequently promoted to Network Manager of the Institute's Local Area Network (LAN),[1] and attained full-time status in June 1992.

Before he became a full-time employee, difficulties arose between Helmuth and his supervisor, Morna Mellor, regarding Helmuth's relations with other Institute employees. The record contains a series of memoranda beginning as early as September 1991, concerning Helmuth's critical remarks about fellow employee Dan LaSota. Other employees also had problems with Helmuth, most noticeably Paul Delys. Mellor reprimanded Helmuth on June 12, 1992, about his difficulty maintaining relations with his co-workers. She told him that his interaction with co-workers was seen as an "attitude problem" and a "communication problem." On June 15 Mellor again reprimanded Helmuth for his ongoing dispute with and criticism of LaSota. The reprimands informed Helmuth that he was seen as "arrogant, non-communicative and obstructionist." Mellor told Helmuth that "the only solution" was to improve his daily interaction with his fellow employees.

Before Helmuth's elevation to full-time status, Mellor asked him to provide a routine "status report" concerning his ongoing activities. From April 23 to 28, 1992, Mellor and Helmuth exchanged a series of electronic mail messages, culminating in Helmuth's transmission of a five-page message covering his activities on a single day. Mellor stated that this was not what she needed, and explained that she wanted a description of the types of activities he performed daily at work. As of May 27, Mellor had not received Helmuth's status report.

On July 27 Helmuth circulated a copy of a memorandum to a number of superiors, including the Institute Director, and to other end users of the LAN. In part, the memorandum was accusatory of Helmuth's co-worker Paul Delys and derogatory towards Mellor. Mellor responded in a strongly worded written reprimand. She stated that the July 27 memorandum was "unprofessional and unacceptable" and "was full of errors both in form and content." She told him that he "drew conclusions which were not valid, [and] stated things in such a way as to force conclusions from readers which were invalid." Mellor prohibited Helmuth from issuing any work-related memoranda under any circumstances without first clearing them through her.

Thereafter, Mellor and Helmuth communicated more frequently by electronic mail than in person, although they worked in

---

1. Helmuth's primary job responsibilities involved operation of the GI computer networks. These networks consist of more than a dozen LANs, the GI ethernet, and facilities like the rocket range or satellite receiving systems, the UAF campus network, and wide area networks such as SPAN and BITNET.

"very confined quarters" and easily could have communicated in person. Helmuth's electronic mail messages often included refusals to comply with Mellor's requests.

In late July 1992, after meeting with Helmuth's supervisors and a member of the Computer Advisory Committee, Mellor instructed Helmuth to write a memorandum to users of the LAN advising them of future update work on the LAN.[2] She told Helmuth that

> [t]he primary objective of the meeting was to insure that in the future any planned adjustments to the network no matter how seemingly insignificant will be done at night or over a weekend, thus impacting the fewest number of users. In addition, it is essential to warn the network users with as much advanced notice as is possible through written communications and Public Address announcements. This is your responsibility to accomplish, and you assured us that in the future you will provide this kind of communication.

On August 12, after some delay by Helmuth and some prompting, Helmuth submitted a draft memorandum to Mellor. The draft was a well-written, two-page single-spaced history of the network, its changes, and its goals. The last two paragraphs contained some of the information desired by Mellor, but did not otherwise meet her directive that Helmuth was to inform network users of the expected occurrence of future network problems. Mellor gave Helmuth further direction to change the memorandum, suggesting that he write two memoranda—one discussing the LAN's history, and another discussing the details of anticipated work with a "time-line" of when network users could expect interruptions or outages. Mellor directed Helmuth to keep the second memorandum to a single page.

A series of communications between Helmuth and Mellor followed. On August 14 Helmuth presented a second memorandum to Mellor. This memorandum was very similar in form and content to the memorandum which Mellor had rejected. The new version was one and one-half pages in length, set in smaller type, and reworded minimally; except for the final three paragraphs, much of it discussed a history of the network. Mellor advised Helmuth that the memorandum did not meet her directive and she rejected it.

A brief discussion followed which left Mellor believing that Helmuth was unwilling to draft a memorandum satisfying her instructions. The differing perceptions of Helmuth and Mellor about this discussion are set out *infra.*

On August 17 Mellor circulated to LAN users a three-quarter page memorandum she had written herself. On August 18 Mellor sent Helmuth a memorandum that reviewed the August 14 incident and accused Helmuth of insubordination.[3] Helmuth disputed her charge of insubordination and threatened to seek relief through the University grievance process.

Both before and after the August 14 incident, there was considerable effort by Helmuth to obtain his performance evaluation. On August 17 he received a three-page evaluation. The evaluation stated that Helmuth "exceeds expectations" or "meets expectations" in areas requiring technical competence and that his greatest strength is his technical ability. It also stated, however, that he "needs improvement" in communicating with network users and co-workers, and in providing "written communication in a short, concise and frequent manner." Helmuth responded in a six-page, single-spaced memorandum; he devoted four and one-half pages to attacking Mellor and accusing her of harassment, erratic judgment, improper manipulation of fiscal information, and illegal use of Institute funds, and spent only one and one-half pages discussing his evaluation.[4]

---

**2.** In mid-July the system had "crashed," leaving the integrity of the LAN in question.

**3.** The memorandum stated in part: "This is another clear example of your not doing as requested/instructed by your supervisor. This is certainly not the first time, but I am stating clearly that

it needs to be the last. It is not acceptable behavior. I consider it insubordination."

**4.** Operations Manager Bob Grove informed Helmuth that the first four and one-half pages of his response were "inappropriate and unacceptable" because they did not address Helmuth's evaluation. .Grove stated that he would not accept that

In a September 2 memorandum, Mellor reiterated her charge of insubordination and warned Helmuth that another similar incident would warrant "further disciplinary action including dismissal."

On September 14 Helmuth attended a meeting with Mellor and Operations Manager Bob Grove, in which Helmuth received a termination notice for insubordination. The charge of insubordination was based on Helmuth's failure to complete the network outage memorandum as instructed, and his failure to provide Mellor with minutes of the network meetings or a copy of his notes from those meetings.[5] Mellor's notice stated: "I find your behavior of August 14, 1992, to be in absolute defiance of my authority." Helmuth was permitted to state his disagreement with the action taken.[6] Subsequently, Helmuth telephoned Grove to orally grieve his wrongful dismissal and to request his "due process." At the time, the University of Alaska written policies did not provide for a pre-termination hearing.

Helmuth filed a number of grievances, all of which were rejected by Mellor, Grove, and the Institute Director. An administrative hearing was conducted to address these grievances. When the April 5, 1993 hearing commenced, the parties stipulated that all grievances would be merged into Helmuth's termination-for-insubordination grievance and heard as a single proceeding.[7] The

hearing officer found that Helmuth was insubordinate. The hearing officer also found that the University failed to provide Helmuth with a pre-termination hearing in accordance with his due process rights. Thus, the hearing officer concluded Helmuth had been unlawfully discharged on September 14, 1992. However, the hearing officer also concluded that Helmuth was lawfully discharged at the post-termination hearing which commenced April 5, 1993.

Helmuth appealed the hearing officer's finding that he was insubordinate. The superior court affirmed the hearing officer's decision. This appeal followed.

### III. DISCUSSION

■ The only issue Helmuth raises on appeal is whether substantial evidence supported the hearing officer's finding of insubordination. Helmuth's grievance was adjudicated pursuant to the Administrative Procedure Act, AS 44.62.330–.630, which applied to UAF at the time of the grievance.[8] Alaska Statute 44.62.570(c) provides the appropriate standard of review: when agency findings are challenged, an abuse of discretion is established if the findings are not supported by either the weight of the evidence or substantial evidence in light of the whole record.

---

portion of the response as a valid response and would only place the last one and one-half pages in Helmuth's file. Helmuth filed a grievance concerning Grove's action. In response to this grievance, the Institute Director placed Helmuth's full response into his personnel file. However, the Director also placed a copy of his letter in response to Helmuth's grievance in the file in order to "point out to [Helmuth] errors in a number of [his] statements." The Director's letter reviewed Helmuth's complaints regarding Mellor and defended Mellor's responsibilities and authority to oversee the department's budget, to allocate the work and resources within the department, and to request from department employees certain standards of performance. An investigation regarding Helmuth's allegations of Mellor's impropriety concluded that the allegations were "unfounded."

5. The termination notice also included a general allegation of Helmuth's inability and unwillingness to perform at the level required of his position.

6. On two occasions Grove recommended mediation to Helmuth and provided him with the names and phone numbers of UAF mediators. Helmuth did not choose to mediate.

7. The insubordination charge was based on Helmuth's nonperformance and refusal to comply with both written and oral directives issued to him by Mellor. This charge encompassed the August 14 incident as well as Helmuth's failure to furnish Mellor with notes from weekly network meetings and his overall inability and unwillingness to perform with a minimum of supervision.

8. The provisions of the Administrative Procedure Act (APA) applied to UAF pursuant to former AS 44.62.330(a)(45). The legislature subsequently exempted the University of Alaska from the administrative adjudication provisions of the APA. Ch. 30, § 1, SLA 1993.

Supervisor Mellor instructed Helmuth to prepare a memorandum regarding the potential problems that network users might face in the next four months. Mellor was dissatisfied with Helmuth's memorandum because it was too long and because it did not address succinctly the anticipated impact on the users of updating the network.[9] The critical information she wanted conveyed was buried in the last two paragraphs of the two-page memorandum. Mellor requested that Helmuth separate his ideas into two memoranda. The original memorandum was to concentrate specifically on notifying users of the impending network outages. A second memorandum could be prepared concerning the network history. However, Helmuth again furnished Mellor with a single memorandum that was only slightly shorter and in a smaller font, and that was only minimally revised. The critical information—regarding network outages—was again buried in a discussion of network history. Helmuth stated that he believed the users needed all the information contained in a single memorandum, effectively rejecting her directive to separate the information into two memoranda.[10] Ultimately, Mellor prepared the memorandum herself because she felt Helmuth was refusing to follow her directive. She ultimately terminated Helmuth as insubordinate.

▮▮ An employee's willful refusal to obey the reasonable instructions of the employer is grounds for discharge. *Central Alaska Broadcasting v. Bracale,* 637 P.2d 711, 713 (Alaska 1981). "[W]hen an order given is reasonable and consistent with the contract, the failure to obey it is always a material breach as a matter of law." *Id.* Helmuth does not argue that Mellor's order to write the memorandum was unreasonable or inconsistent with his employment contract. He instead complains that he was not given

the opportunity to comply with Mellor's directive. Thus, he argues that a charge of insubordination is invalid unless the employee is first given an opportunity to comply with a direct order, and then refuses to comply with the order before it is rescinded.

Helmuth mischaracterizes the events leading to his discharge. Mellor requested a specific memorandum several days prior to the incident, rejected Helmuth's initial draft prior to the final incident, and requested a single-page revision limited to discussing the impact of network adjustments on network users, including a suggested "time-line." Helmuth's second draft differed only minimally from the draft Mellor rejected. It contained the same substantive infirmities that caused Mellor to reject the first draft and to issue precise instructions on preparation of a second draft. After reading the second draft, Mellor asked Helmuth whether he was going to correct the second draft or whether she would have to do it herself. Helmuth told her to "take a crack at it." Mellor responded that she would not merely *attempt to write the memorandum,* she would do it. Helmuth had already had two previous opportunities to comply with Mellor's request to write the memorandum as directed.

Mellor testified regarding the August incident:

> He ... handed me the copy. I asked him ... if it was the same thing and he said that I could take a crack at it because I told him if he was saying that he wasn't going to do it—if he was refusing to do the memo, that I would write it. And he said, well, take a crack at it. And I told him I was not going to take a crack at it; I would do it. And he said fine and turned around and left.
>
> ·....

9. In a self-prepared job description, Helmuth stated that the internetwork is "mission critical to many GI programs," and that it "must be maintained in an operational state."

10. In an electronic mail message, Helmuth stated in relevant part:
    I looked at your comments and the draft and I hope this revision meets or exceedes [sic] your expectations. I found it very difficult to seper-

ate [sic] the two memos are [sic] you suggested, as the memo is tied very strongly to the concept of network upgrades that must happen. I also found that in the interests of communication, that a memo summarizing the changes that is to all GI faculty and staff was really a good idea, particularly since it had been a very long time since the last network update.

I told him that I wanted it separated. I told him that it had to be separated; that I wanted a short one; that I didn't want this. And he said, "Well, I think the users need to be ... aware of what's been going on in the network." ... But I can tell you there was no question in my mind, absolutely, he was not going to separate that memo into two memos. And he stood there defiantly in my doorway and just looked at me and that's when I said, "If you're telling me that you're refusing to do this, if you're refusing to rewrite this memo into two different memos, then"—it was a very difficult time because I realized we'd come to ... the end at that point. So, that's why I struggle here because it was a moment of recollection and—and recognition on my part that—that he wasn't going to do it.

. . . .

He said he really felt that it—all the information had to get out; that he had a problem with putting it out that way. I remember him stating there was a problem with that, meaning that he didn't think it was an appropriate thing to do, not that he was having a problem because obviously he knows how to write. And that I—I said to him, "Are you saying that you refuse to write this? Are you refusing to do this? Because if you are—"I didn't give him a chance to answer, by the way. I said, "If you are, then I want to write it." And he said, "Take a crack at it." And I said, "I will not take a crack at it." That I remember distinctly. "I will write it." ... And then he said, "Go ahead...." And he certainly didn't jump in and say, "No, no, let me try it again. I know that you want this. Please, let's regroup." There was no offer, nothing. Just go ahead. Gone. Out the door.

Helmuth testified about the same incident:

I handed her the memo. As I did, I said, "Morna, I'm having problems with this. Can we go over it? Why don't you give it a read?" She took the memo, separated the two pages, saw there were two pages, put them down on her PC's keyboard and said that was unacceptable. I said, "What? What can we do?" She said it

was too long and I stated again I'm having problems getting this out. I've had—I alluded to the fact that I've had other things going on that day, that I wasn't getting a lot of time to sit and write memos. Nevertheless, I'd sat down and written that, and said "I'm having problems. Can you help me?" She said, "Why? And I said, "There's stuff in here, I don't know how much the users do need to know. Some of it I really think the users do need to know, but I don't know where to draw the line. Can you help me with this? That was—I can't repeat word for word what went on there. What happened next, I think I can pretty much repeat word for word. She said something about, "Well, do you want me to write it?" And my impression, given the context that we were talking about, was that I wanted—that she was asking me whether she would take the memo, mark it up, write it the way she thinks it ought to be, give it back to me and I would put it out. I said, "Sure, go ahead, try it." Her response to me was, "I will not try it. I will do it." That response to me was, "I will not try it. I will do it." That response took me aback. I was shocked at the strength of her reaction and said, "Okay. I'm not going to dispute that," and soon thereafter left the office.

Mellor disputed Helmuth's characterization of his alleged request for help:

He said he thought that the users needed to hear it [the entire content of his draft memo]. He never asked for help, I can tell you that. He did not say he didn't know how to do it. He said that he felt that the ... users of the network needed to hear the whole story and I don't remember any other details of what he said because he just wasn't doing it, he wasn't going to do it. So, I really can't help you beyond that. He wasn't going to do it. It was clear.

The hearing officer found Mellor's testimony to be credible. The hearing officer also rejected as not credible Helmuth's testimony concerning vital factual matters, and found that his "testimony contained many excuses and a certain air of arrogance which was

consistent with his attitude problem exhibited in the Record."

■ Since the hearing officer had an opportunity to observe the witnesses when they testified, we accord great weight to his evaluation of the witnesses' credibility and demeanor. *Cf. Parker v. Northern Mixing Co.,* 756 P.2d 881, 892 (Alaska 1988) ("it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence"); *Sheridan v. Sheridan,* 466 P.2d 821, 824 (Alaska 1970) ("great weight must be accorded to the trial judge's experience and to his evaluation of demeanor testimony").

The record supports a finding that Helmuth's relationship with his supervisor was deteriorating and that his conduct caused problems with other employees. When viewed in this context, Helmuth's failure to write the memorandum as requested and to correct it as directed amounted to insubordination, supporting a conclusion that he did not intend to write the memorandum his supervisor instructed him to write. When Mellor told Helmuth that if he was refusing to write it correctly, she was going to do it, she was extending to Helmuth a final opportunity to comply with the instructions he had previously rejected. She was effectively asking whether he was continuing to reject her instruction. It was the third time she asked him to perform the task. Helmuth's intimation that he did not have the skills or the time to produce the requested memorandum in one short document containing only information regarding future outages is patently unpersuasive and disingenuous. He was a skilled writer.

The task of separating the warning message about the outages from the longer general memorandum about the network was not complicated. The essential message could be readily and concisely put in memorandum form. Thus, his statement that she should "try" to write it was, in context, a refusal to do what she had previously told him to do. The hearing officer did not err in finding that Helmuth's response to Mellor's inquiry constituted insubordination.

Although the memorandum incident directly led to Helmuth's discharge, there had been several other incidents of insubordination and problems with Helmuth's general attitude for many months. The hearing officer made the following findings: Helmuth exhibited an intolerance for perceived incompetence in other employees which resulted in a number of overt acts of disobedience and inappropriate conduct by Helmuth, such as the LaSota memorandum. This conduct increased in the summer of 1992 when Helmuth developed an attitude of possessiveness towards the network. He also neglected to train co-workers, and failed to perform certain assigned duties such as preparing detailed minutes of meetings. The numerous electronic mail messages between May and August 1992 evidence instances of impertinence, guile, and unwillingness to conform to Mellor's directives. Helmuth created his own set of rules, such as determining that he did not need to return certain equipment to the Institute despite specific requests by Mellor that he do so. Throughout this period, Helmuth's conduct warranted chastisement by Mellor via electronic mail. Finally, she wrote several memoranda containing reprimands and admonitions, including the threat of termination.

The record amply supports a finding of insubordination. Helmuth rejected Mellor's instruction to separate the narrative history of the network from the critical information—which was to serve essentially as a warning—about times the network would be unavailable to users. The record supports a conclusion that in rejecting that instruction, Helmuth intentionally decided, contrary to his superior's instruction, that this memorandum should prominently feature a history of the network. His August 14 comments, as described by Mellor, support a conclusion that he felt the historical information "had to get out" and that he "had a problem" with transmitting the requested memorandum without it. Mellor testified that he "didn't think it was an appropriate thing to do." Helmuth was thus also rejecting her underlying reasons for insisting on a concise memorandum focused on the anticipated outages.

We conclude that substantial evidence supports the finding that Helmuth's failure to write the requested memorandum regarding

the network outages constituted insubordination, and that the hearing officer did not abuse his discretion in finding that Helmuth was insubordinate. It is therefore unnecessary to address the issue of whether Helmuth was also insubordinate in not providing Mellor with his notes from the network meetings.

## IV. CONCLUSION

We AFFIRM the hearing officer's decision that Helmuth was insubordinate and that his termination was justified.

MATTHEWS, Justice, dissenting.

Helmuth's supervisor, Morna Mellor, was not initially going to fire Helmuth because of the August 14th incident. In a memo to Helmuth dated August 18, 1992, Mellor recounted the incident and warned him about it:

This is another clear example of your not doing as requested/instructed by your supervisor. This is certainly not the first time, but I am stating clearly that it needs to be the last. It is not acceptable behavior. I consider it insubordination.

Again, on September 2, 1992, Mellor reiterated her memo of August 18th concerning the August 14th incident and issued an explicit warning:

Should another incident occur in which you refuse to comply, or otherwise exhibit behavior which is in any way interpreted by me as in defiance of established authority, it will be necessary for me to take further disciplinary action including dismissal.

On September 15, 1992, Mellor terminated Helmuth. In a written notification of termination she gave three reasons. The first was Helmuth's inability and unwillingness to perform with a minimum of supervision. In connection with this reason Mellor mentioned Helmuth's memo of September 10, 1992, in which he asked for help "deciding the priority of the tasks you have assigned me." The second reason was the incident of August 14, 1992. In connection with this reason, Mellor

alluded to previous incidents of conduct by Helmuth which she regarded as other examples of insubordination. As the third reason for firing Helmuth she cited his failure to furnish her with notes of weekly network meetings:

In addition, on August 6, 1992 I asked you for at least a photocopy of your notes taken during the weekly network meetings after you informed me you did not have time to prepare weekly minutes. I received only the one meeting's notes, which were inadequate, and nothing since. In my memo of September 2, 1992 I specifically asked that notes pertaining to the three weeks' network meetings be provided during the week, therefore due by September 4, 1992. Again I received nothing. These actions are clearly insubordinate.

Although Mellor did not initially intend to fire Helmuth because of the August 14th incident, and when she did fire Helmuth she did so for three reasons, one of which was the August 14th incident, the hearing officer sustained Helmuth's dismissal on the basis of the August 14th incident and did not discuss the other two grounds relied on by Mellor.

In my view the incident of August 14th is insufficient as a cause for termination. Mellor first asked Helmuth to write a memo to network users advising them that work was going to be done on the network which would entail closing it down. Helmuth wrote such a memo but it was longer than Mellor wanted and she told him to make it shorter. On August 14th he presented her with a second draft which was only slightly shorter than the first and explained that he was having a problem making it shorter and that he felt that all that he had included was important. At that point Mellor said that she would write the memo herself and she did so. Helmuth's only failing was that, having been told once to make the memo shorter (not twice or three times), he decided to try to persuade his boss that the memo would be better in longer form. This seems like a normal initiative on the part of an employee and I do not believe it should be condemned as insubordination.[1]

---

1. I can say as one who has supervised numerous law clerks over the years that the substance, but not the emotional tone, of the conversation is familiar.

The other two grounds given by Mellor for discharging Helmuth are facially adequate to justify his discharge. However, for reasons not explained in this record, these grounds were not relied on by the hearing officer. Assuming that these grounds were not waived by the University, I would remand this case to the superior court with instructions to remand the case to the hearing officer for a determination of the adequacy of these grounds.