**Adriana NYBERG, a/k/a Mickey Nyberg, Appellant,**

v.

**UNIVERSITY OF ALASKA, Appellee.**

No. S–7734.

Supreme Court of Alaska.

March 20, 1998.

James M. Hackett, Law Offices of James M. Hackett, Inc., Fairbanks, for Appellant.

Mark E. Ashburn, Ashburn & Mason, Anchorage, for Appellee.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE, and BRYNER, JJ.

*OPINION*

FABE, Justice.

I. *INTRODUCTION*

The University of Alaska terminated Adriana "Mickey" Nyberg from employment for insubordination. Following a hearing, the Statewide Grievance Council found that Nyberg was insubordinate and recommended to University President Jerome Komisar that

Nyberg's termination grievance be dismissed. President Komisar accepted the Grievance Council's recommendation. On appeal, the superior court upheld the University's decision. We conclude that the Grievance Council improperly found that Nyberg was insubordinate and reverse.

## II. FACTS AND PROCEEDINGS

Nyberg was director of Payroll and Benefit Accounting at the University under the supervision of the executive director of Human Resources, Patty Kastelic. Soon after the University moved the payroll office to the offices of Human Resources in 1993, friction developed between Nyberg and Kastelic. In May 1993 Kastelic sought to address the problems she was experiencing with Nyberg by holding a meeting with her and requesting that Randy Weaver, the director of Statewide Internal Audit, review the matter. In a confidential memorandum to Kastelic, Weaver concluded that Nyberg "[did] not appear to be effective at providing guidance, support and supervision" to her staff. He also indicated that tension existed between Nyberg and the staff and that the staff felt caught in the middle of a conflict between Nyberg and Kastelic. Kastelic and Nyberg discussed Weaver's report, and Kastelic was initially encouraged that the situation was improving.

The friction between Nyberg and Kastelic, however, did not abate. On Monday, August 30, 1993, Kastelic delivered a memorandum to Nyberg that discussed problems with Nyberg's performance and behavior.[1] In the memorandum, Kastelic informed Nyberg that they would write a plan together that day and meet with others in the office over the next few days to discuss ways to improve the work environment. Kastelic concluded the memorandum by stating that "[p]rogress toward identified goals will be documented in writing on a weekly basis until the current work related difficulties are behind us."

Pursuant to the memorandum, Kastelic and Nyberg met with members of the department on August 30 and 31 to discuss the workplace problems. Nyberg became upset and did not report to work the next day, September 1.

On Thursday, September 2, Kastelic delivered a second memorandum to Nyberg.[2] In this memorandum she recounted the recent history of workplace problems and efforts to resolve them. She explained that Nyberg was not "performing at an acceptable level" and that Nyberg had three months to improve her performance:

> If your performance does not improve consistently and demonstrably during the next three months I will be required to take whatever action is necessary to assure that the work of your department is accomplished in a timely and professional manner.

> It is my clear intention by the writing of this memo to offer you a constructive opportunity to perform the duties and re[s]ponsibilities of your position.

Kastelic further informed Nyberg that she would be placing the memorandum, related memoranda, and a formal written evaluation in Nyberg's personnel file.

Later that day, Kastelic approached Nyberg to discuss the issues raised in Kastelic's second memorandum. Nyberg told Kastelic that the memorandum was inaccurate and that she had turned it over to her attorney. Nyberg explained that she would be filing a grievance and that she "preferred not to discuss the issues involved in the grievance until it was formalized." Kastelic replied that Nyberg was required to discuss the issues contained in the memorandum and that she should be prepared to do so the following day.

On the morning of Friday, September 3, Kastelic again approached Nyberg to discuss the issues Kastelic had raised earlier in the week. The parties' recollections of their conversation differ slightly but significantly. Kastelic claims that Nyberg refused to discuss any workplace issues, and that Nyberg stated that on advice of her attorney she would no longer communicate directly with Kastelic. Nyberg maintains, however, that

1. Although the memorandum was delivered to Nyberg on August 30, it is dated August 27.

2. Although Kastelic completed and delivered the memorandum to Nyberg on September 2, it is dated September 1.

she merely told Kastelic that discussion of her grievance should proceed through her attorney. She denies stating that she would no longer communicate directly with Kastelic. In a September 7 letter to Kastelic, Nyberg distinguished between discussing her grievance and discussing other matters:

Finally, I respectfully submit that I never advised you on September 3, 1993 that my attorney told me not to communicate directly with you. I simply informed you that I was seeking legal assistance to help me prepare a grievance and that any communications about that grievance (which is now two separate grievances) should go through my attorney.

Following the September 3 conversation, Kastelic drafted a memorandum stating her intention to discharge Nyberg from employment "because you are not competent to carry out the essential duties of your position and you have [been] in the past and are today insubordinate to me, your direct supervisor." Kastelic placed Nyberg on administrative leave without pay effective immediately, and scheduled a pre-termination hearing for September 7. Later that day, Kastelic received two grievance letters from Nyberg. The letters grieved, among other things, Kastelic's creation of a hostile work environment, Kastelic's issuance of "accusatory, conclusory, and inaccurate" memoranda, and Kastelic's placement of Nyberg on administrative leave.

A pre-termination hearing was held on September 7. Nyberg appeared with her attorney to deliver a letter in which she disputed the charges against her. Ten days later, Kastelic formally discharged Nyberg based upon her "acts of insubordination," including Nyberg's "statements that you would not communicate with me on issues related to your grievance, the content of which was unknown to me at the time."

Nyberg then filed her third grievance letter. This grievance addressed the decision to terminate her employment. The Grievance Council reviewed all three of Nyberg's grievances and recommended that they be dismissed without a hearing.

President Komisar nonetheless directed the Grievance Council to conduct a hearing to hear Nyberg's termination grievance.

The hearing included thirty-three hours of testimony from eighteen witnesses. Following the hearing, the Grievance Council again recommended the dismissal of Nyberg's termination grievance. President Komisar accepted the recommendation.

Nyberg appealed to the superior court, which issued a memorandum decision affirming Nyberg's dismissal for insubordination. Nyberg appeals.

## III. DISCUSSION

### A. Standard of Review

■ We independently review the merits of administrative determinations, giving no deference to the decision of the superior court as the intermediate court of appeal. See Handley v. State, Dep't of Revenue, 838 P.2d 1231, 1233 (Alaska 1992). We review questions of fact, such as whether the University properly found Nyberg insubordinate, under the substantial evidence test. See id. We review questions of law not involving agency expertise under the substitution of judgment test. See id.

### B. The Record Does Not Contain Substantial Evidence That Nyberg Was Insubordinate.

■ An employee's willful refusal to obey an employer's reasonable instructions is a ground for discharge. See Helmuth v. Univ. of Alaska Fairbanks, 908 P.2d 1017, 1021 (Alaska 1995) (citing Central Alaska Broad. v. Bracale, 637 P.2d 711, 713 (Alaska 1981)). We have upheld a finding of insubordination where there was substantial evidence that an employee intentionally refused to comply with reasonable written and oral directives issued by the supervisor. See Helmuth, 908 P.2d at 1020 n. 7, 1023–24. In this case, we must determine whether Kastelic's instructions to Nyberg were both reasonable and sufficiently clear to enable Nyberg to understand what was required by her employer. See id.; Bishop v. Municipality of Anchorage, 899 P.2d 149, 155 (Alaska 1995) (affirming a finding of insubordination where an employee refused to obey an order after being given "clear notice of what was required of him"). If we conclude that the instructions were reasonable and sufficiently

clear, we must then determine whether Nyberg willfully refused to obey them.

█ In this case, the Grievance Council found that Nyberg's "refusal to consider, respond to, and discuss the issues raised in [Kastelic's] memos" constituted insubordination. As an initial matter, we examine whether Nyberg refused to consider and respond to Kastelic's three memoranda. We consider each memorandum in turn.

First, Kastelic's August 30 memorandum identified workplace problems and required Nyberg to meet with staff members "to improve this situation."[3] Nyberg complied with this directive by meeting with Kastelic and other staff members on August 30 and 31 to discuss workplace problems. Second, Kastelic's September 2 memorandum offered Nyberg "a constructive opportunity to perform the duties and responsibilities of [her] position." While the memorandum required Nyberg to provide "a response in writing concerning [her] intentions," it also stated that Nyberg had three months to improve her performance and gave no deadline for her written response. Nyberg provided a written response to Kastelic's memorandum in the form of her first grievance letter which she filed the next day. The grievance letter alleged that the memorandum was inaccurate and "designed to further degrade our working relationship." Finally, Kastelic's September 3 memorandum placed Nyberg on

administrative leave effective immediately and required no response. Nyberg nonetheless responded by filing her second grievance letter, which she delivered to Kastelic's office the same day.

In sum, Nyberg considered and responded in writing to each of Kastelic's memoranda. We conclude that the record does not support the Grievance Council's finding that Nyberg was insubordinate for refusing to consider and respond to the issues raised in Kastelic's three memoranda.

█ The question of whether Nyberg was insubordinate therefore turns on her alleged refusal to discuss workplace problems with Kastelic pursuant to Kastelic's oral directives on September 2 and 3.[4] We consider whether Kastelic's oral directives were both reasonable and sufficiently clear to enable Nyberg to understand what was required of her. *See Helmuth*, 908 P.2d at 1021; *Bishop*, 899 P.2d at 155.

The University contends that on September 2 Kastelic ordered Nyberg to be prepared the next day to discuss the issues contained in the September 2 memorandum.[5] The following day, when Kastelic insisted that they needed to discuss the issues, Nyberg responded, "I have nothing more to say to you about those issues or any issues relating to my grievance."[6]

The University contends that Nyberg also told Kastelic that, on the advice of counsel,

---

3. In the August 30 memorandum, Kastelic also stated that "[w]e will write a plan together today." In the September 2 memorandum, she stated "we will jointly develop a written work plan." It is unclear from the record whether such a plan was ever written.

4. In fact, although the Grievance Council based its finding of insubordination in part on Nyberg's failure to consider and respond in writing to Kastelic's memoranda, the University bases its argument on its contention that Nyberg refused to obey Kastelic's reasonable oral orders to discuss workplace problems.

5. The University characterizes these issues as workplace problems and efforts to resolve them.

6. Kastelic's testimony at the pre-termination hearing included the following exchange with the University's counsel:

Q: And [did] you have contact with Ms. Nyberg the morning of September 3rd?
A: Yes, I [did].

Q: And do you recall approximately when that was?
A: Sometime between eight and nine, I went into her office and said, "Well, we need to sit down and discuss the issues that I raised all this week." And she said, "I have been told that I do not have to discuss those issues with you."
Q: And how did you respond to that?
A: "We—we cannot work that way. I cannot supervise you through your attorney. We need to talk about those issues."
Q: And [did] you then discuss those issues?
A: No.
Q: Why not?
A: She refuse[d] to. She said, "I have nothing more to say to you about those issues or any issues relating to my grievance." And I said, "I don't even know what's in your grievance. You have got to talk to me about the issues relating to your supervision, your interaction with other staff. You cannot prevent us from having performance-related discussions."

she would no longer communicate directly with Kastelic. Nyberg maintains that she never refused to talk directly to Kastelic, and in a letter delivered at her termination hearing Nyberg stated that she had "simply informed [Kastelic] that [she] was seeking legal assistance to help [ ] prepare a grievance and that any communications about that grievance . . . should go through [her] attorney."[7]

 The University concedes that Nyberg was "entitled to state that communications about a grievance which might be filed in the future should be directed to her attorney." It argues, however, that Nyberg was not entitled "to refuse to communicate altogether with her supervisor about performance problems in the workplace." We agree that Nyberg was not entitled to refuse entirely to communicate with Kastelic about workplace problems. Where an employee has filed a grievance relating to her supervisor's conduct, however, she cannot be found insubordinate for her refusal to obey the supervisor's order to discuss the very problems she has raised in the grievance. To hold otherwise would be to vitiate the grievance process. *Cf. Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 73, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) (observing that where a grievance procedure required an employee to complain to her supervisor whose conduct was the subject of the grievance, the grievance procedure did not encourage victims of harassment to come forward). Regardless of Kastelic's intentions, she neither clarified that Nyberg was not required to discuss the grievance issues nor specified the non-grievance issues she sought to discuss with Nyberg. In the absence of' such clarification, Nyberg could have reasonably construed Kastelic's orders to discuss workplace prob-

lems as orders to discuss the issues raised in her grievance.

We conclude that if Kastelic was ordering Nyberg to discuss matters contained in the grievance against Kastelic, the order was not reasonable. If, on the other hand, Kastelic simply wished to discuss workplace issues that fell outside the scope of the grievance, then she was required to say so clearly and unambiguously, in order to prevent Nyberg from construing her request as a demand to discuss the matters contained in the grievance. Because Kastelic failed to do this, her oral directives to Nyberg were not sufficiently clear to support a finding of insubordination.[8] *See, e.g., Bishop,* 899 P.2d at 155.

## IV. CONCLUSION

We conclude that substantial evidence does not support the Grievance Council's finding that Nyberg was insubordinate. Accordingly, we REVERSE President Komisar's acceptance of the Grievance Council's determination that Nyberg was insubordinate and that her termination was justified.[9]

---

7. Kastelic's September 17 letter formally terminating Nyberg's employment is consistent with Nyberg's version of events. It cites Nyberg's "statements that you would not communicate with me on issues related to your grievance" as "acts of insubordination."

8. Given our conclusion that Kastelic failed to give a reasonable order that was sufficiently clear to Nyberg, we need not address whether Nyberg willfully refused to obey Kastelic's orders.

9. Nyberg also argues that the University denied her due process by not providing an impartial tribunal to hear her grievance, violated its own regulations and her implied contract by not placing her on disciplinary probation prior to dismissing her, and violated the implied covenant of good faith and fair dealing. Because we dispose of the case on the insubordination issue, we need not reach these arguments.